CONTINUATION OF APPLICATION FOR

SEARCH WARRANT

## **INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for over two years.  In that capacity, I am authorized to conduct investigations of violations of federal criminal law and have significant experience in the investigation of criminal activities. I am currently assigned to the FBI's Detroit Division, Bay City Resident Agency, where my duties include investigating a multitude of violations including Native American crimes, economic espionage, civil rights violations, health care fraud, computer crimes, and related crimes.  Prior to employment with the FBI, I graduated from the University of Akron School of Law in May of 2006, passed the Ohio Bar Exam, and was employed as a research assistant at LexisNexis for almost three years.

2.      This affidavit is made in support of a search warrant.  This affiant believes that there is probable cause to search the premises listed on **Attachment A** (collectively, the "U.S. Rehab Facilities"), **Attachment B** (collectively, the "Lakeshore Spine & Pain Facilities"), and **Attachment C** (collectively, the "Lakeshore Home Health Facilities") for evidence of health care fraud and violations of the federal Anti-Kickback Statute, including the items described more fully in **Attachment D**.

3.      In or around October 2011, FBI Cooperating Witness 2 and Cooperating Witness 4 (both identified below) provided a list of offices for U.S. Rehab Facilities, Lakeshore Spine & Pain Facilities, and Lakeshore Home Health Facilities.  This list identified each of the sites in **Attachments A, B, and C**, as operational facilities. In January 2012, FBI Cooperating Witness 2 (identified below) confirmed for each of the sites listed in **Attachments A**, **B**, and **C**, that each site is either an operational facility of U.S. Rehab, Lakeshore Spine & Pain, or Lakeshore Home Health or, if closed for operations, is currently under the control of these same companies and used to store records and/or computers that contain items to be seized as described more fully in **Attachment D**.  The control and use of the sites listed in **Attachments A**, **B**, and **C** by these same companies has also been confirmed by physical surveillance involving one or more federal agents, other documents provided by cooperating witnesses, review of corporate records, and other witness statements.

4.      The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation from other individuals, including other law enforcement officers, consultation with the United States Attorney's Office for the Western District of Michigan (the "U.S. Attorney's Office"), my review of documents, records, photographs, audio and video recordings (including consensually- and covertly-recorded conversations involving cooperating sources[1]), other records relating to this investigation,

---

[1]  This affidavit includes summary descriptions of a number of consensually-recorded conversations. Those summaries are based on reviews of the recordings, draft transcripts, interviews with the

communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.  Because this affidavit is submitted for the limited purpose of establishing probable cause in support of an application for a search warrant, it does not set forth each and every fact that I have learned during the course of this investigation.

5.     Based on an investigation by the FBI, the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), and the Michigan Attorney General's Office (the "Michigan AG"), there is probable cause to believe that from at least 2008 until the present time: (1) Babubhai Bhurabhai Rathod ("RATHOD"), Rajesh Makwana ("MAKWANA"), and Raju Nakum ("NAKUM") conspired to pay illegal kickbacks to physicians, mid-level practitioners (physician assistants and nurse practitioners, *e.g.*), and medical assistants to induce the referral of federal health care program business in violation of 18 U.S.C. § 371 and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and (2) MAKWANA submitted fraudulent claims to federal health care programs and private insurers in violation of 18 U.S.C. § 1347.

## THE INDIVIDUALS

6.     RATHOD is an Indian citizen and a naturalized U.S. citizen.  As discussed more fully below, RATHOD, a former physical therapist, owns outpatient rehabilitation clinics, medical offices, and home health agencies, among other things.  RATHOD's various entities—including, but not limited to, U.S. Rehab Services, P.C., Lakeshore Spine & Pain, P.C., and Lakeshore Home Health Care, Inc.—do business throughout the State of Michigan.

7.     MAKWANA is an Indian citizen who is present and working in the United States on an H-1B visa, which allows American employers to temporarily employ foreign workers in specialty occupations.  As discussed more fully below, MAKWANA is currently employed as the administrator and systems analyst at Lakeshore Spine & Pain, P.C., an entity owned by RATHOD that operates medical offices throughout the State of Michigan.

8.     NAKUM is an Indian citizen who is a lawful permanent resident of the United States.  As discussed more fully below, NAKUM is the president and current registered agent of U.S. Rehab Services, P.C., an entity owned by RATHOD that operates outpatient rehabilitation clinics throughout the State of Michigan.

## INVESTIGATIONS OF RATHOD IN 2002 AND 2004

9.     In 2002, the State of Michigan charged RATHOD and Emerald Physical Therapy and Rehabilitation, Inc. ("Emerald Physical Therapy"), an entity owned by RATHOD, with eight counts of falsifying medical records, four counts of health care fraud, two counts of fraud or larceny over $1,000, and one count of conspiracy to commit fraud or larceny.  The State of Michigan alleged, among other things, that between December 1999 and July 2000, RATHOD billed Medicare and a Medicaid HMO for outpatient physical therapy services that were never

---

cooperating sources, my experience as a law enforcement officer and the experience of other law enforcement officers in this investigation, as well as the investigation to date.

provided.  On or about February 28, 2003, Emerald Physical Therapy, through RATHOD, pleaded guilty to one count of falsifying medical records.  Emerald Physical Therapy agreed to pay $7,544 in restitution to Medicare and/or United Government Services and $10,000 in investigative costs to the Michigan AG and HHS.

10.     In or around 2003, the State of Michigan charged RATHOD with fourth-degree criminal sexual conduct after one of RATHOD's patients complained about inappropriate contact during a physical therapy session.  RATHOD ultimately pleaded *nolo contendere* to a charge of assault and battery and was sentenced to 1 year of probation.

11.     In or around August 2004, RATHOD's physical therapy license was summarily suspended as a result of his assault and battery conviction.  RATHOD applied for reinstatement in or around July 2006.  That application was denied on or about May 6, 2009, when the State of Michigan, Bureau of Health Professions accepted an administrative law judge's finding that, among other things, RATHOD failed to disclose other complaints, by patients, of inappropriate touching by RATHOD.  RATHOD's suspended physical therapy license has since expired.  As noted above, RATHOD now owns and operates outpatient rehabilitation clinics, medical offices, and home health agencies, among other things, throughout the State of Michigan.

## CORPORATE BACKGROUND

### Outpatient Rehabilitation Entities

12.     U.S. Rehab Services.  RATHOD owns U.S. Rehab Services, P.C. ("U.S. Rehab"), a company registered at 555 South Mission Street, Mt. Pleasant, Michigan 48858 that operates clinics throughout the State of Michigan which provide staffing and outpatient rehabilitation services (the "U.S. Rehab Facilities").  A list of the U.S. Rehab Facilities is attached hereto as **Attachment A**.  U.S. Rehab was incorporated in 2001 with RATHOD's wife, Shaila Rathod, acting as the company's resident agent.  NAKUM is U.S. Rehab's president and current resident agent.  According to the Michigan Department of Licensing and Regulatory Affairs website, U.S. Rehab also transacts business as Physical Therapy & More and Clare Physical Therapy.  As set forth below, 555 South Mission Street, Mt. Pleasant, Michigan 48858 is also the address of medical offices operated by RATHOD and included in **Attachment B**.  Based on information discussed in Paragraph 3 above, the entire building at 555 South Mission Street, Mt. Pleasant, Michigan 48858 is utilized as a U.S. Rehab Facility and a Lakeshore Spine & Pain Facility.

13.     U.S. Rehabilitation Services (Michigan).  Upon information and belief, RATHOD owns U.S. Rehabilitation Services, Inc., a company registered at 5511 West U.S. Highway 10, Ludington, Michigan 49431 that provides outpatient rehabilitation services.  According to the Michigan Department of Licensing and Regulatory Affairs website, U.S. Rehabilitation Services was incorporated by NAKUM in 2005.  MAKWANA is the company's current registered agent.

14.     Other Outpatient Rehabilitation Entities.  In addition to U.S. Rehab and U.S. Rehabilitation Services, RATHOD also owns a number of different entities that operate outpatient rehabilitation clinics throughout the State of Michigan, as well as in North Carolina and Georgia.  These entities include, but are not limited to:

a.     Michigan Institute of Rehabilitative Services.    Upon information and belief, RATHOD owns Michigan Institute of Rehabilitative Services, Inc. ("Michigan Rehab"), a company based in Mio, Michigan that provides outpatient rehabilitation services. RATHOD's wife, Shaila Rathod, acts as the company's registered agent.  According to the Michigan Department of Licensing and Regulatory Affairs website, Michigan Rehab also transacts business as American Physical Therapy & Rehabilitation Center, Inc. ("American Physical Therapy").

b.     Mission Physical Therapy.    Upon information and belief, RATHOD owns Mission Physical Therapy, Inc. ("Mission Physical Therapy"), a company registered at 555 South Mission Street, Mt. Pleasant, Michigan 48858 that provides outpatient rehabilitation services. Mission Physical Therapy was incorporated in 2002.  RATHOD's wife, Shaila Rathod, acts as the company's registered agent.  According to the Michigan Department of Licensing and Regulatory Affairs website, Mission Physical Therapy also transacts business as U.S. Rehab Services of MI.

c.     Emerald Physical Therapy.    As noted above, RATHOD owns Emerald Physical Therapy, a company registered at 555 South Mission Street, Mt. Pleasant, Michigan 48858 that provides outpatient rehabilitation services.  Emerald Physical Therapy was incorporated in 1999.  RATHOD's wife, Shaila Rathod, acts as the company's registered agent.

d.     U.S. Rehabilitation Services (North Carolina).    Upon information and belief, RATHOD owns U.S. Rehabilitation Services, Inc., a company registered at 1022 Hutton Lane, Suite 110, High Point, North Carolina 27262 that provides outpatient rehabilitation services.   The North Carolina Secretary of State website lists U.S. Rehabilitation Services' principal office as 5511 West U.S. Highway 10, Ludington, Michigan 49431, and the company's mailing address as 555 South Mission Street, Mt. Pleasant, Michigan 48858.

e.     Georgia Rehab Services (Georgia).  Upon information and belief, RATHOD owns Georgia Rehab Services, Inc. ("Georgia Rehab"), a company registered at 5109 Highway 278, Suite C, Covington, Georgia 30014 that provides outpatient rehabilitation services. The Georgia Secretary of State website lists RATHOD as the company's CEO, CFO, and Secretary.

**Medical Offices**

15.    Lakeshore Spine & Pain.   RATHOD owns Lakeshore Spine & Pain, P.C. ("Lakeshore Spine & Pain"), a company registered at 5511 West U.S. Highway 10, Ludington, Michigan 49431 that operates medical offices throughout the State of Michigan which provide, among other things, physical medicine services (the "Lakeshore Spine & Pain Facilities").  A list of the Lakeshore Spine & Pain Facilities is attached hereto as **Attachment B**.  Lakeshore Spine & Pain was incorporated in 2003, with Abid Agha, M.D., acting as the company's resident agent. MAKWANA is Lakeshore Spine & Pain's administrator and systems analyst. As set forth below, 5511 West U.S. Highway 10, Ludington, Michigan 49431 is also the address of an outpatient rehabilitation clinic operated by RATHOD and included in **Attachment A**, and a Lakeshore

4

Home Health Facility operated by RATHOD and included in **Attachment C**.  Based on information discussed in Paragraph 3 above, the entire building at 5511 West U.S. Highway 10, Ludington, Michigan 49431 is utilized as a U.S. Rehab Facility, a Lakeshore Spine & Pain Facility, and a Lakeshore Home Health Facility.

16.    Lakeshore Spine & Pain Entities.  According to the Michigan Department of Licensing and Regulatory Affairs website, Lakeshore Spine & Pain operates a number of other health care companies, including (1) Lakeshore Visiting Physicians; (2) Lakeshore Health Care Services; (3) Lakeshore Family Practice; (4) Lakeshore Health Park; (5) Accessible Urgent Care; (6) Accessible Health Center/Urgent Care; (7) After Hours Urgent Care; and (8) James Street Clinic Services.

17.    Lakeshore Visiting Physicians.  Lakeshore Visiting Physicians is a company owned by RATHOD that is organized under Lakeshore Spine & Pain.  Lakeshore Visiting Physicians, located at 1380 East Main Street, Edmore, Michigan 48829, provides house calls and in-home medical services.  According to the company's website, Lakeshore Visiting Physicians also coordinates services such as physical therapy and home health care for its patients.  Facts developed during this investigation reveal that physicians and mid-level practitioners that work in Lakeshore Spine & Pain medical offices also work for Lakeshore Visiting Physicians.  As set forth below, 1380 East Main Street, Edmore, Michigan 48829 is also the address of an outpatient rehabilitation clinic operated by RATHOD and included in **Attachment A**, and a Lakeshore Spine & Pain Facility operated by RATHOD and included in **Attachment B**.  Based on information discussed in Paragraph 3 above, the entire building at 1380 East Main Street, Edmore, Michigan 48829 is utilized as a U.S. Rehab Facility, a Lakeshore Spine & Pain Facility, and for Lakeshore Visiting Physicians.

**Home Health Care Entities**

18.    RATHOD owns at least three home health care entities that provide home health care services to patients throughout the State of Michigan.  A list of those entities (collectively, the "Lakeshore Home Health Facilities") and their locations is attached hereto as **Attachment C**.  Those entities include, but are not limited to:

    a.    Lakeshore Home Health Care.  RATHOD owns Lakeshore Home Health Care, Inc. ("Lakeshore Home Health"), a company registered at 5511 West U.S. Highway 10, Ludington, Michigan 49431 that provides home health care services.  Lakeshore Home Health was incorporated in 2006, with RATHOD's wife, Shaila Rathod, acting as the company's resident agent.

    b.    Lakeshore Home Care.  RATHOD owns Lakeshore Home Care, Inc. ("Lakeshore Home Care"), a company registered at 1380 East Main Street, Edmore, Michigan 48829 that provides home health care services.  Lakeshore Home Care was incorporated in 2010.  NAKUM acts as the company's current registered agent.

    c.    Lakeshore Home Care Services.  RATHOD owns Lakeshore Home Care Services, Inc. ("Lakeshore Home Care Services"), a company registered at 1105 South Mission Street, Mt. Pleasant, Michigan 48858 that provides home health care services.  Lakeshore Home Care Services was incorporated in 2011 with Bhivak Hindocha, the

former administrator of Lakeshore Visiting Physicians, acting as the company's resident agent.

## OVERVIEW OF INVESTIGATION

19.    In or around July 2011, FBI and HHS-OIG received a referral from a source (identified as FBI Cooperating Witness 3 below) relating to several schemes allegedly being perpetrated by RATHOD.  The referral included allegations that (1) providers were receiving "bonus" checks from RATHOD and others that were linked to referrals of physical therapy and home health care services to entities owned by RATHOD; and (2) Lakeshore Spine & Pain was fraudulently submitting claims to federal health care programs and private insurers using improper billing codes.

20.    As discussed more fully below, evidence collected during the course of this investigation establishes probable cause that RATHOD, MAKWANA, and NAKUM are conspiring to pay illegal kickbacks to physicians, mid-level practitioners (physician assistants and nurse practitioners, *e.g.*), and medical assistants for referring or facilitating the referral of patients to entities owned by RATHOD for physical therapy, electrodiagnostic testing, and home health care services in violation of 18 U.S.C. § 371 and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "Kickback Scheme").  Facts developed during the course of this investigation establish probable cause that the illegal kickbacks are structured as follows:

a.    Physical Therapy Referrals.  For referring patients to entities owned by RATHOD for physical therapy services, physicians and mid-level practitioners receive either $50 per patient (if the patient is insured by Medicaid) or $100 per patient (if the patient is insured by Blue Cross Blue Shield of Michigan, Medicare, an auto insurer, or a workers' compensation plan).  To the extent that medical assistants facilitate these referrals, those assistants receive $10 per patient, regardless of the patient's insurer.  These amounts are only paid if the patient visits an entity owned by RATHOD three or more times for physical therapy services.

b.    Electrodiagnostic Testing Referrals.  For referring patients to Lakeshore Spine & Pain for electrodiagnotic testing—specifically, nerve conduction tests and needle electromyography tests ("needle EMGs")—physicians and mid-level practitioners receive either $50 per patient (if the patient is insured by Medicaid) or $100 per patient (if the patient is insured by Blue Cross Blue Shield of Michigan, Medicare, an auto insurer, or a workers' compensation plan).  To the extent that medical assistants facilitate these referrals, those assistants receive $10 per patient, regardless of the patient's insurer. Based on my review of Medicare claims data obtained from TrustSolutions LLC, a Medicare Program Safeguard Contractor, the only physicians currently performing nerve conduction tests and needle EMGs at Lakeshore Spine & Pain are Abid Agha, M.D. and Larisa Bruma, M.D.

c.    Home Health Care Referrals.    For referring patients to entities owned by RATHOD for home health care services, physicians and mid-level practitioners receive either $50 per patient (if the patient is referred while the physician or mid-level practitioner is working for Lakeshore Visiting Physicians) or $300 (if the patient is

referred from the physician or mid-level practitioner's medical office).  To the extent that medical assistants facilitate these referrals, those assistants receive $10 per patient.  These amounts are only paid if the patient receives home health care services from an entity owned by RATHOD three or more times.

21.     As discussed more fully below, facts developed during the course of this investigation also establish probable cause that MAKWANA is defrauding federal health care programs and private insurers in violation of the federal health care fraud statute, 18 U.S.C. § 1347.  More specifically, there is probable cause to believe that MAKWANA is causing Lakeshore Spine & Pain to submit claims to federal health care programs and private insurers using billing codes that misrepresent the services actually rendered at the Lakeshore Spine & Pain Facilities listed on **Attachment B**.

## THE KICKBACK SCHEME

### Information Provided By FBI Cooperating Witness 1

22.     During the course of this investigation, a number of FBI Cooperating Witnesses have provided information that corroborates the Kickback Scheme outlined above.  FBI Cooperating Witness 1 ("CW-1") was employed twice by U.S. Rehab.  CW-1 was first employed by U.S. Rehab in the summer of 2010 as a medical administrator.  He/she reported to RATHOD and worked at the U.S. Rehab facility at 1380 East Main Street, Edmore, Michigan 48829.  Within thirty days of working at U.S. Rehab, and as discussed more fully below, CW-1 left U.S. Rehab due to compliance problems at the medical offices that were reported to RATHOD but were not corrected.  After RATHOD made weekly calls asking CW-1 to return, CW-1 returned to work at U.S. Rehab in or around April 2011.  CW-1 then worked as the rehabilitation and marketing director at the U.S. Rehab facility at 555 South Mission Street, Mt. Pleasant, Michigan 48858 until December 2, 2011.

23.     Part of CW-1's job responsibilities was to deliver so-called "referral checks" to providers.  Specifically, CW-1 stated that in or around May 2011, FBI Cooperating Witness 2 ("CW-2") gave CW-1 checks addressed to practitioners and instructed CW-1 to hand-deliver those checks to the recipients.  When CW-1 inquired what the checks were for, CW-2 stated that U.S. Rehab and Lakeshore Spine & Pain pay practitioners for referring patients for physical therapy, electrodiagnostic testing, and home health care services.  CW-2 told CW-1 that payments were calculated based on the type of service that was referred and the patient's insurer.

24.     In light of CW-1's job responsibilities, CW-1 became familiar with the basic process by which practitioners are paid for physical therapy referrals to U.S. Rehab.  CW-1 stated that NAKUM was responsible for contacting physicians that were potential referral sources in the areas surrounding the U.S. Rehab Facilities.  NAKUM met with these physicians and discussed the arrangements by which the physicians would be paid for referring patients to the U.S. Rehab Facilities.  CW-1 explained that an individual at each U.S. Rehab location—including the U.S. Rehab Facilities listed on **Attachment A**—tracked referrals from these physicians in a spreadsheet on his or her computer.  Each month, those spreadsheets were printed and faxed to CW-2 at U.S. Rehab's Mt. Pleasant, Michigan facility at 555 South Mission Street, Mt. Pleasant, Michigan 48858.  CW-2 then calculated the payment amounts based on the service referred and

7

the patient's insurer.  CW-2 then gave the payment information to Amanda Gillespie in U.S. Rehab's Accounts Payable department.  Amanda Gillespie completed the payment checks and gave the checks to CW-1 and CW-2 to deliver to practitioners.  CW-1 explained that the completed checks had different descriptions in their respective "Memo" lines—including "Mileage" and "Medical Director"—in order to hide the fact that the checks were payments for referrals.  CW-1 stated that NAKUM was involved in determining how payment checks were described, whether it be "Mileage," "Medical Director," or a different classification.  CW-1 stated that certain practitioners received cash payments from NAKUM for referring patients to U.S. Rehab Facilities.  CW-1 further stated that certain other practitioners received cash payments from RATHOD for referring patients to U.S. Rehab Facilities.

**Documents Provided By CW-1**

25.     During the investigation, CW-1 provided examples of the documents described above, including referral spreadsheets and CW-2's payment calculations.  CW-1 also provided copies of checks written from two bank accounts: (1) PNC Bank Account Number 425155XXXX, in the name of Lakeshore Spine & Pain (the "Lakeshore Spine & Pain/PNC Account"); and (2) PNC Bank Account Number 425155XXXX, in the name of U.S. Rehab (the "U.S. Rehab/PNC Account").

26.     I am informed that during the course of this investigation, the U.S. Attorney's Office issued an Authorized Investigative Demand to PNC Bank Records Service (the "PNC AID") for, among other things, all checks for $200 and over issued from the Lakeshore Spine & Pain/PNC Account and the U.S. Rehab/PNC Account.  I am further informed that on or about October 21, 2011, the U.S. Attorney's Office received copies of these checks in response to the PNC AID.

**May 2011 Referral Documents**

27.     The documents that CW-1 provided included a document labeled, "Jackson May 2011." The document contains a header—"06/08/2011 11:47 5177968210 US REHB SERVICES Page 02"—consistent with a document being faxed from the U.S. Rehab Facility in Jackson, Michigan.  The document contains a spreadsheet entitled "May 11."  A true and correct copy of that spreadsheet, with patient names redacted, is set forth below:

8

| Medical Record # | Admission Date | Patient Name | Referring Physician | Primary Insurance | Secondary Insurance | Discharge Date | Total visit | |
|---|---|---|---|---|---|---|---|---|
| JO374 | 5/3/2011 | J    C | Dr. Witt | Auto | | 5/31/2011 | 1 | |
| JO375 | 5/6/2011 | L    K | Dr. Witt | HPM | | | 10 | 50 |
| JO376 | 5/6/2011 | A    J | Dr. Witt | Medicare | | 5/24/2011 | 6 | 100 |
| JO377 | 5/10/2011 | D    B | Dr. Witt | HPM | | | 9 | 50 |
| JO378 | 5/10/2011 | C    L | Dr. Witt | Auto | HPM | | 4 | 100 |
| JO379 | 5/12/2011 | J    R | Dr. Witt | BCBS | | 5/13/2011 | 1 | ✓ |
| | | | | | | | | |
| | | | | | | | | |

28.     The "May 11" spreadsheet contains several hand-written numbers next to patients that appear to have visited the U.S. Rehab Facility in Jackson, Michigan more than three times.  For example, next to patient L.K., who appears to be insured by Health Plan of Michigan, a Medicaid contractor, is the number "50."  Next to patient A.J., who appears to be insured by Medicare, is the number "100."  The hand-written numbers on the "May 11" spreadsheet total 300.

29.     Facts developed during the course of this investigation establish that the "Dr. Witt" identified in the "May 11" spreadsheet is Kevin S. Witt, D.O., an osteopathic physician practicing in Jackson, Michigan.

30.     The documents that CW-1 provided also included a hand-written document labeled "May 2011" (the "May 2011 List").  CW-1 identified the May 2011 List is an example of CW-2's hand-written calculations of how much physicians, mid-level practitioners, and medical assistants are paid for referrals.

31.     The May 2011 List contains the names of physicians, mid-level practitioners, and medical assistants.  CW-1 identified these individuals as sources of referrals to the entities that RATHOD owns and controls.  Next to each individual's name is a dollar amount.  CW-1 identified these amounts as the total payment for the individual's referrals.  Below each individual's name is a shorthand description of a U.S. Rehab Facility ("Glad PT," "Jack PT," "Mt.P PT," "G. Rapids PT," e.g.), the surname of a physician at Lakeshore Spine & Pain who performs electrodiagnostic testing (i.e., "Bruma"), and/or a shorthand description of another entity owned by RATHOD ("H. Care," e.g.).  Each description or surname is accompanied by a dollar amount.  CW-1 stated that these surnames and descriptions identify each referral in May 2011 that the individual was paid for.

32.     As set forth in the excerpts attached below, the May 2011 List includes "Dr. Witt."  Next to Dr. Witt's name is "$300."  Underneath Dr. Witt's name is "Jack PT - $300."  This calculation, which appears to be for Dr. Witt's referrals to the U.S. Rehab Facility in Jackson, Michigan, corresponds with the hand-written numbers described in Paragraphs 27 and 28 above.



33.     I am informed that in response to the PNC AID, the U.S. Attorney's Office received a copy of a check, Check Number 1340, issued from the Lakeshore Spine & Pain/PNC Account to Kevin Witt at what appears to be Dr. Witt's home address, 445 Roxbury Circle, Jackson, Michigan 49203.  A true and correct copy of that check is attached below.  The check, in the amount of $300, listed "Mileage – May" in the memo section.  The check was signed by RATHOD.



## July 2011 Referral Documents

34.     The documents that CW-1 provided also included a hand-written sheet labeled "July 2011" (the "July 2011 List").  CW-1 identified the July 2011 List is another example of CW-2's hand-written calculations of how much physicians, mid-level practitioners, and medical assistants are paid for referrals.

35.     The July 2011 List contains the names of physicians, mid-level practitioners, and medical assistants.  CW-1 identified these individuals as sources of referrals to the entities that RATHOD owns and controls.  Next to each individual's name is a dollar amount.  CW-1 identified these amounts as the total payment for the individual's referrals.  Below each individual's name is a shorthand description of a U.S. Rehab Facility ("Mt. P," "Jac PT," "Lan," or "Lan PT," *e.g.*), the surname of a physician at Lakeshore Spine & Pain who performs electrodiagnostic testing (*i.e.*, "Agha" or "Bruma"), and/or a shorthand description of another entity owned by RATHOD ("LVP," *e.g.*).  Each description or surname is accompanied by a dollar amount.  CW-1 stated that these surnames and descriptions identify each referral in July 2011 that the individual was paid for.

36.     As set forth in the excerpts attached below, the July 2011 List includes "Niti Thakur," who, upon information and belief, is Niti Thakur, M.D., an independent physician practicing at

Lansing Rheumatology, P.L.L.C. in East Lansing, Michigan.  Next to Dr. Thakur's name is "$200."  Underneath Dr. Thakur's name is "Lan PT 1 - $100, Lan 1 - $100."



37.     Among the checks that CW-1 provided is a check, Check Number 10620, for $200, dated August 11, 2011, written from the U.S. Rehab/PNC Account to Niti Thakur at "6200 Pine Hallow [sic] Drive, Ste 400, East Lansing, MI 48823," the address for Lansing Rheumatology. The check is signed by RATHOD.  The "Memo" line of the check reads, "Medical Director – July."  A true and correct copy of this check is set forth below.  CW-1 stated that this check was not for a medical directorship, but for physical therapy services that Dr. Thakur referred to a U.S. Rehab facility in Lansing, Michigan.  As discussed more fully below in Paragraphs 46 through 48, CW-1 delivered this check to Dr. Thakur at the offices of Lansing Rheumatology, 6200 Pine Hollow Drive, Suite 400, East Lansing, Michigan 48823 in or around October 25, 2011.



38.     As set forth in the excerpts attached below, the July 2011 List also includes "Dr. Rais," who, upon information and belief, is Muhammad Salman Rais, M.D., an independent physician practicing at Dewitt Family Practice in Dewitt, Michigan.  Next to Dr. Rais's name is "$250." Underneath Dr. Rais's name is "Bruma - $100, Lan PT - $100, Lan 2 - $50."



39.     CW-1 provided a completed check, Check Number 10621, for $250, dated August 11, 2011, written from the U.S. Rehab/PNC Account to Salman Rais at "13811 Myrtle Dr, Dewitt, MI 48820," Dr. Rais's home address.  The check is signed by RATHOD.  The "Memo" line of the check reads, "Medical Director – July."  A true and correct copy of this check is set forth

below.  As discussed more fully below in Paragraphs 64 through 66, CW-2 delivered this check to Dr. Rais at Dewitt Family Practice, 12775 Escanaba Drive, Dewitt, Michigan 48820 on or about December 16, 2011.



40.     As set forth in the true and correct excerpts attached below, the July 2011 List also includes "Dr. Witt," who, as noted above, is Kevin S. Witt, D.O., an independent physician practicing in Jackson, Michigan.  Next to Dr. Witt's name is "$250."  Underneath Dr. Witt's name is "Jac PT – $250."

41.     CW-1 provided a check, Check Number 1616, for $250, dated August 11, 2011, written from the Lakeshore Spine & Pain/PNC Account to Kevin Witt at "445 Roxbury Circle, Jackson, MI 49203," which appears to be Dr. Witt's home address.  The check is signed by RATHOD.  The "Memo" line of the check reads, "Mileage – July."  A true and correct copy of this check is set forth below.  CW-1 explained that this check was not for mileage, but for physical therapy services that Dr. Witt referred to the U.S. Rehab facility in Jackson, Michigan.  As discussed more fully below in Paragraphs 43 through 45, CW-1 delivered this check to Dr. Witt at 762 West Michigan Avenue, Suite A, Jackson, Michigan 49201 on or about October 25, 2011.



42.    CW-1 stated that referral checks similar to those identified in Paragraphs 33, 37, 39, and 41 are or have been delivered to a number of other physicians, mid-level practitioners, and medical assistants.

**October 25, 2011: Recorded Conversation With Kevin Witt, D.O.**

43.    On or about October 25, 2011, at the request of law enforcement, CW-1 recorded a conversation with Kevin Witt, D.O. at Dr. Witt's medical office, located at 762 West Michigan Avenue, Jackson, Michigan 49201.  The conversation was recorded in both audio and video.

44.    During the conversation, CW-1 hand-delivered three checks paid to the order of Kevin Witt totaling $550.00.  One check, the check identified in Paragraph 41 above, was issued from the Lakeshore Spine & Pain/PNC Account in the amount of $250.00 and listed "Mileage – July" in the memo section.  Another check, Check Number 10823, was issued from U.S. Rehab/PNC Account in the amount of $200.00 and listed "Medical Director – August" in the memo section.  Another check, Check Number 11018, was issued from U.S. Rehab/PNC Account in the amount of $100.00 and listed "Medical Director – September" in the memo section.  The checks were all signed by RATHOD.  CW-1 confirmed that these checks were not for mileage or medical director services, but were for physical therapy services that Dr. Witt referred to U.S. Rehab.

45.    At the time of delivery, CW-1 handed Dr. Witt what CW-1 called "reimbursement checks."  Dr. Witt responded by quickly taking the checks into his custody, placing them in his pocket, and stating that they should only be mailed to his home address in the future.  The conversation continued after delivery of the checks, with CW-1 stating that U.S. Rehab was slow in Jackson.  Dr. Witt responded, "I'll try to pump some more people your direction."  Later in the conversation, after CW-1 asked Dr. Witt for the address where he would prefer to receive his "referral checks," Dr. Witt stated he would like his checks mailed to his home address.

**October 25, 2011: Recorded Conversation With Niti Thakur, M.D.**

46.    On or about October 25, 2011, at the request of law enforcement, CW-1 recorded a conversation with Dr. Niti Thakur at the offices of Lansing Rheumatology, 6200 Pine Hollow Drive, Suite 400, East Lansing, MI 48823.  The conversation was recorded in both audio and video.

47.     During the conversation, CW-1 hand delivered 3 checks paid to the order of Dr. Thakur totaling $600.00. All three checks were issued from the U.S. Rehab Services/PNC Account. One check, the check identified in Paragraph 37 above, was issued in the amount of $200.00 and listed "Medical Director – July" in the memo section.  Another check, Check Number 10822, was issued in the amount of $300.00 and listed "Medical Director – August" in the memo section.  Another check, Check Number 11016, was issued in the amount of $100.00 and listed "Medical Director – September" in the memo section.  The checks were signed by RATHOD. CW-1 confirmed that these checks were not for medical director services, but were for physical therapy services that Dr. Thakur referred to U.S. Rehab.

48.     At the time of delivery, CW-1 handed Dr. Thakur the checks, which CW-1 described as "referral checks for the last couple months."  Dr. Thakur responded by taking the checks into her custody and verbally acknowledging receipt by stating "okay." The conversation continued by CW-1 stating that the company appreciates the referrals, and they are also willing to take more referrals whenever she has them.  Dr. Thakur responded, "Okay."  Dr. Thakur later stated that she has referred more patients to U.S. Rehab and expressed an interest in having patients use a therapy pool soon to be built at a U.S. Rehab Facility in Lansing, Michigan.

### November 7, 2011: Recorded Conversation With Andre Smith, M.D.

49.     On or about November 7, 2011, at the request of law enforcement, CW-1 recorded a conversation with Andre Smith, M.D. at Optimum Health Clinic, 3960 Patient Care Way, #108, Lansing, Michigan 48911.  The conversation was recorded in both audio and video.

50.     During the conversation, CW-1 hand-delivered one check paid to the order of Andre Smith totaling $100.00. The check, Check Number 1779, was issued from the Lakeshore Spine & Pain/PNC Account and listed "Contractual – August" in the memo line.  The check was signed by RATHOD.  CW-1 confirmed that this check was not for contractual labor, but was for Dr. Smith's referring patients to U.S. Rehab for physical therapy.  Based on my review of documents provided by CW-1, this check appears to be compensation for Dr. Smith's referring a patient who was insured by Medicare.

51.     At the time of delivery, CW-1 handed Dr. Smith the check, and said, "This is for last month."  Dr. Smith replied, "Okay, thank you very much."  During the conversation, CW-1 asked Dr. Smith whether he was busy.  When Dr. Smith replied in the affirmative, CW-1 said, "That could be good for us."  Dr. Smith replied, "I'll send them all down there."  CW-1 said, "We appreciate it."  CW-1 also said, "I'm glad to hear you're busy, we appreciate your referrals."  Dr. Smith responded, "I'll keep sending them your way."

### Information Provided By FBI Cooperating Witness 2

52.     CW-2 started working as the marketing director at U.S. Rehab in or around July 2007, and is currently the director of management for U.S. Rehab and Lakeshore Spine & Pain.  CW-2's job responsibilities include managing the Lakeshore Spine & Pain medical offices and handling staff-related issues at U.S. Rehab.  CW-2's job responsibilities involve calculating how much physicians, mid-level practitioners, and medical assistants receive for referrals to entities owned by RATHOD.  CW-2's job responsibilities also involve delivering referral checks to providers.

53.    CW-2 stated that in approximately 2008, RATHOD instructed CW-2 to keep track of all physical therapy, electrodiagnostic testing, and home health care referrals to entities that RATHOD owns and controls.

54.    CW-2 stated that he/she obtains monthly referral reports from the U.S. Rehab Facilities listed on **Attachment A**, the Lakeshore Spine & Pain Facilities listed on **Attachment B**, and the Lakeshore Home Health Facilities listed on **Attachment C** that identify, among other things: (1) the patient's name; (2) the patient's insurer; (3) the number of times the patient visited the practitioner or entity that he or she was referred to; (4) the name of the referring physician; and (5) the service that was referred.  Each month, CW-2 uses these reports to hand-write a master list of referring providers, the practitioners or facilities that those providers referred patients to, and the dollar amount each referring provider is to receive in exchange for those referrals.  CW-2 stated that RATHOD has instructed him/her to only keep two months' worth of these master lists at a time.

55.    CW-2 stated that after creating the master list, he/she reviews each provider's monthly referral payments with RATHOD.  RATHOD then instructs CW-2 on how checks should be completed.  CW-2 stated that RATHOD is involved in determining how each check is characterized.  CW-2 stated that referral checks are frequently disguised as being for "Mileage," "Medical Director" fees, "Consulting Physician" fees, or "Contractual Labor."  CW-2 also stated that sometimes providers are paid in cash for their referrals.

56.    CW-2 stated that for physical therapy referrals, providers are only paid when the patient attends three or more physical therapy sessions.  At that point, providers are paid $100 for referring Blue Cross Blue Shield of Michigan patients, $100 for referring Medicare patients, $100 for referring auto insurance patients, $100 for referring workers' compensation patients, and $50 for referring Medicaid patients.  CW-2 stated that to the extent medical assistants are involved in facilitating these referrals, those assistants receive $10 per patient.

57.    CW-2 stated that providers are paid for referring electrodiagnostic testing—specifically, nerve conduction tests and needle EMGs—to Dr. Agha and Dr. Bruma, both of whom practice with Lakeshore Spine & Pain.  CW-2 stated that in exchange for referring electrodiagnostic testing, providers receive $100 for referring Blue Cross Blue Shield of Michigan patients, $100 for referring Medicare patients, $100 for referring auto insurance patients, $100 for referring workers' compensation patients, and $50 for referring Medicaid patients.  CW-2 stated that to the extent medical assistants facilitate these referrals, those assistants receive $10 per patient.

58.    CW-2 stated that providers are paid for referring patients to RATHOD's home health care companies once the patient receives three home health care visits.  At that point, providers are paid $300.  If, however, a provider refers a patient for home health care services during his or her work for Lakeshore Visiting Physicians, the provider receives $50.  CW-2 stated that to the extent medical assistants facilitate these referrals, those assistants receive $10 per patient

**November 11, 2011: Recorded Conversation with Kyle Gandy, P.A.**
**And John Roberts, P.A.**

59.    On or about November 11, 2011, at the request of law enforcement, CW-2 recorded a conversation with Kyle Gandy, P.A. and John Roberts, P.A., two physician assistants at Cornell

Health and Wellness/Central Michigan Urgent Care, 520 North Mission Street, Mt. Pleasant, Michigan 48858.  The conversation was recorded in both audio and video.

60.     During the conversation, CW-2 hand delivered two checks to Kyle Gandy.  One check, paid to the order of Kyle Gandy, totaled $270.  That check, Check Number 2108, was issued from the Lakeshore Spine & Pain/PNC Account and lists "Contractual Labor 10/23/11 to 11/01/11 6 Hours" in the memo line.  That check was not signed.  The second check, paid to the order of Kyle Gandy, totaled $350.  That check, Check Number 2105, was issued from the Lakeshore Spine & Pain/PNC Account and lists "Contractual – October" in the memo line.  That check was signed by RATHOD.  CW-2 confirmed that this check was not for contractual labor, but was for Gandy's referring patients to entities owned by RATHOD for physical therapy and electrodiagnostic testing.

61.     At the time of delivery, CW-2 told Gandy she had a paycheck and a referral check for him.  Gandy said, "Oh, awesome," and acknowledged that one of the checks was "for referrals."  CW-2 told Gandy that, "We got a lot of PT from you at the beginning of October and that kind of tapered off, but we got a bunch of EMGs."  Gandy said, "Sweet," and asked how things were going.  When CW-2 told Gandy that things were busy, Gandy said, "I'm doing my part."

62.     During the conversation, CW-2 also hand delivered a check paid to the order of John Roberts totaling $400.  The check, Check Number 2104, was issued from the Lakeshore Spine & Pain/PNC Account and lists "Contractual – October" in the memo line.  The check was signed by RATHOD.  CW-2 confirmed that this check was not for contractual labor, but was for Roberts' referring patients to entities owned by RATHOD for physical therapy and electrodiagnostic testing.

63.     At the time of delivery, Roberts told CW-2, "I love it when you bring me money."  CW-2 handed Roberts the check and said, "You need to step it up.  You're low."  CW-2 told Roberts that his payment was about average and that his referrals were split between referrals for physical therapy and electrodiagnostic testing.  Roberts told CW-2 that sometimes patients do not show up for physical therapy, but that he "write[s] a bunch" of referrals.

**December 19, 2011: Recorded Conversation With Muhammad Salman Rais, M.D.**

64.     On or about December 19, 2011, at the request of law enforcement, CW-2 recorded a conversation with Muhammad Salman Rais, M.D. at Dewitt Family Practice, 12775 Escanaba Drive, Suite 1, Dewitt, Michigan 48820.  The conversation was recorded in both audio and video.

65.     During the conversation, CW-2 hand-delivered a check to Dr. Rais—the check identified in Paragraph 39 above—issued from the U.S. Rehab/PNC Account in the amount of $250.  The check listed "Medical Director – July" in the memo section.  The check was signed by RATHOD.  CW-2 confirmed that this check was not for medical director services, but was for (1) electrodiagnostic testing that Dr. Rais referred to Dr. Bruma; and (2) physical therapy services that Dr. Rais referred to U.S. Rehab.

66.     At the time of delivery, CW-2 handed Dr. Rais the check and said she was delivering his "referral checks."  Dr. Rais said, "Okay," and asked where CW-1 was.  CW-2 told Dr. Rais that

CW-1 had left the company, but to e-mail him/her if Dr. Rais needed anything.  Dr. Rais said, "Alright, thank you."

67.     CW-2 stated that referral checks similar to those identified in Paragraphs 33, 37, 39, 41, 60, 62, and 65 are or have been delivered to a number of other physicians, mid-level practitioners, and medical assistants.

## Information Provided By FBI Cooperating Witness 3

68.     During the course of this investigation, another FBI Cooperating Witness, FBI Cooperating Witness 3 ("CW-3"), independently provided additional information that further corroborates the Kickback Scheme.

69.     CW-3 is a physician employed by Lakeshore Spine & Pain who works three days each week at Accessible Health Center/Urgent Care ("Accessible Health"), a medical office operated by Lakeshore Spine & Pain that is located at 4478 Dowling Street, Montague, Michigan 49437. CW-3 also works two days each week at the Lakeshore Spine & Pain office in Ludington, Michigan.  CW-3 also occasionally performs house calls and in-home medical services for Lakeshore Visiting Physicians.  CW-3's duties include providing physical medicine services and making patient referrals, as necessary, for rehabilitation services, electrodiagnostic testing, and home health services.

## October 22, 2011: Recorded Conversation With RATHOD And MAKWANA

70.     On or about October 22, 2011, at the request of law enforcement, CW-3 recorded a conversation with RATHOD and MAKWANA.  The relevant portions of the conversation, excerpted below, took place in East Lansing, Michigan.  The conversation was recorded in audio.

71.     During the conversation, RATHOD explained that he would put CW-3 in what RATHOD described as "a bonus program."  MAKWANA told CW-3 that, "[M]onthly, I'll give you a check, a bonus."  When CW-3 asked what the bonus was for, RATHOD and MAKWANA explained that when a patient receives services through a home health care referral, the company makes more money than if the patient is seen in a physician's office.  CW-3 asked whether he would receive a bonus for those home health care referrals.  RATHOD and MAKWANA each answered, "Yes."  RATHOD specifically stated that CW-3 "will get all bonus for referrals . . . ."

72.     During the same conversation, the following exchanges occurred, in which RATHOD and MAKWANA respond to CW-3's concerns that there is "a certain risk there" for him/her in receiving payments for referrals.

> CW-3:       There's a certain risk there for me, so I was wondering how you
>             protect the other providers.
>
> RATHOD:     See, (unintelligible), so your mind will be clearer.  You're working
>             for Lakeshore Spine & Pain.  As long as you getting all money
>             from this company, you don't have to worry.
>
> CW-3:       Okay.

RATHOD:     If you refer ten patient to Lakeshore Home Care.  If Lakeshore Home Care is paying you five hundred dollar, how did you get this money?  For what?

MAKWANA: Then you're in big trouble.

CW-3:     Mm-hmm.  I see.

RATHOD:     It's called kickback.

**********

RATHOD:     If you are getting paid from the Lakeshore Home Health Care or U.S. Rehab Services, then there is trouble.  Or, you send ten patient to U.S. Rehab Services and now you get five hundred dollar, it's called kickback.

CW-3:     Mm-hmm.

MAKWANA: And then, they'll see like how it is.

RATHOD:     That's not good at all.  Not good.  Don't do that.  So you will never get checks from U.S. Rehab . . . .

**********

RATHOD:     But we, again, we are paying you from Lakeshore Spine & Pain so as you long as getting paid from Lakeshore Spine & Pain it's called mileage expense, or it's called a bonus, or it's called uh, your uh, you know, um, any extra work.

MAKWANA: CME or extra work.

RATHOD:     Anything we pay you that way.  So it's nothing you have to worry about, you know.  Yes, we will count internally how much money you generated and we do this money according to that way.  But I mean . . . .  We not writing down, "Oh, you refer five patient to U.S. Rehab Services."  Even in same company, we don't do that.

**********

RATHOD:     As long as you getting paid from the same company you are working, that's called your bonus.  Or mileage expense.  And when you using your own car, we have more luxury to pay you officially: "This is your mileage expenses."  So you can save taxes, too.  So that's what we going to do for you.

**********

18

| | |
|---|---|
| RATHOD: | So, you know, just for example, you send ten patient to U.S. Rehab, and then the U.S. Rehab pay you thousand dollar, then there's problem. |
| CW-3: | And this is how the other doctors do it, too? |
| RATHOD: | All doctors do the same thing. |
| CW-3: | Okay. |
| RATHOD: | Exactly same thing.  So that's why you don't have to worry about it. |
| CW-3: | Okay, that's more reassuring. |

73.    During the conversation, RATHOD instructed MAKWANA to "[g]ive [CW-3] a bonus as a mileage expense so, you know, we don't have to worry about it."  MAKWANA said, "Okay, I will do that.  I will take care of it, that's fine, so doctor won't feel bad things and definitely we'll help [CW-3] out."  RATHOD replied, "Very good."

## THE UP-CODING SCHEME

74.    I am informed that in order to receive reimbursement for services rendered to a patient covered by a health care benefit program, providers are required to identify the service or procedure performed by a code that appears in a manual called Current Procedural Terminology ("CPT").  Payment of providers' claims depends in part on the complexity of procedures as reflected in CPT codes submitted on claim forms.

75.    Facts developed during the course of this investigation establish probable cause that MAKWANA is causing Lakeshore Spine & Pain to submit claims to health care benefit programs using CPT codes that reflect more complex levels of service than the services that were actually rendered to patients at the Lakeshore Spine & Pain Facilities listed in **Attachment B**.  This practice, known as "up-coding," allows Lakeshore Spine & Pain to receive higher reimbursements from health care benefit programs than the company is otherwise entitled to.

## Information Provided By FBI Cooperating Witness 1

76.    CW-1 stated that when he/she first worked for RATHOD in the summer of 2010, part of his/her responsibilities was monitoring the compliance of all Lakeshore Spine & Pain medical offices.  CW-1 stated that as part of his/her duties in this regard, he/she reviewed itemized forms ("superbills") that providers working for Lakeshore Spine & Pain used to identify services that were rendered to patients.  CW-1 then compared the providers' superbills with month-end financial reports showing what Lakeshore Spine & Pain actually billed to health care benefit programs.  CW-1 stated that Lakeshore Spine & Pain's financial reports did not match providers' superbills.  CW-1 stated that the financial reports showed that Lakeshore Spine & Pain billed health care benefit programs for higher levels of service that were not reflected on providers' superbills.

77.     CW-1 stated that he/she complained to RATHOD about an "up-coding problem" within the first thirty days of his/her employment.  RATHOD informed CW-1 that he would take care of it.  CW-1 stated that RATHOD never corrected the problem.  CW-1 further stated that when he/she left U.S. Rehab the first time, he/she complained about up-coding in his/her resignation letter.

78.     CW-1 stated that all of the billing for the Lakeshore Spine & Pain Facilities identified in **Attachment B** is performed by MAKWANA at the main Lakeshore Spine & Pain facility in Ludington, Michigan.  CW-1 further stated that RATHOD is aware that MAKWANA upcodes providers' services before submitting claims to health care benefit programs.

### Information Provided By FBI Cooperating Witness 2

79.     CW-2 stated that part of his/her job responsibilities as the director of management for Lakeshore Spine & Pain is to audit patient files at the Lakeshore Spine & Pain Facilities identified in **Attachment B**.  During these file audits, CW-2 has noticed that what Lakeshore Spine & Pain bills for providers' services often does not match the superbills that providers submit to the Lakeshore Spine & Pain office in Ludington, Michigan.  CW-2 stated that Lakeshore Spine & Pain often bills for higher levels of service that are not reflected on providers' superbills.

80.     CW-2 also stated that a biller employed by Lakeshore Spine & Pain told him/her that Lakeshore Spine & Pain bills for more complex levels of service than the services that are actually rendered to patients.  By way of example, the biller told CW-2 that he/she used the CPT code for a wound issue to describe a physician's service on a superbill, but that service was "upcoded" to an official wound care treatment when the service was billed to a health care benefit program.

81.     CW-2 stated that billing for services rendered at the Lakeshore Spine & Pain Facilities listed in **Attachment B** is performed by MAKWANA at Lakeshore Spine & Pain's main office in Ludington, Michigan.

### Information Provided By FBI Cooperating Witness 4

82.     During the course of this investigation, another cooperating witness, FBI Cooperating Witness 4 ("CW-4") provided additional information that further corroborates the Up-coding Scheme.

83.     CW-4 is a physician employed by Lakeshore Spine & Pain who works at the Lakeshore Spine & Pain medical office located at 1380 East Main Street, Edmore, Michigan 48829.  CW-4's duties include providing physical medicine services and referring patients for rehabilitation services, electrodiagnostic testing, and home health services.

84.     CW-4 stated that he/she has, at times, accessed Lakeshore Spine & Pain's internal billing system (the "eThomas" system) to see what the company was billing for his/her services.  CW-4 found that Lakeshore Spine & Pain routinely bills health care benefit programs for more complex services than what CW-4 actually provides.

**Billing Documents Provided By CW-4**

85.   CW-4 provided numerous examples of printouts from the eThomas billing system which showed that Lakeshore Spine & Pain submitted claims to health care benefit programs using CPT codes for services that were more complex—and eligible for higher reimbursements—than the services CW-4 documented on superbills that CW-4 submitted to Lakeshore Spine & Pain.

86.   For example, CW-4 provided a superbill that he/she completed and provided to Lakeshore Spine & Pain's main office in Ludington, Michigan for services rendered to patient D.A. on February 16, 2011.  For that visit, CW-4 checked the line for "99212."  I am informed that 99212 is the CPT code for an office visit that typically involves minor problems and a ten-minute face-to-face encounter with a patient.  CW-4 also provided a printout from the eThomas system showing that, for that same office visit, Lakeshore Spine & Pain billed McLaren Health Plan using CPT code "99213."  I am informed that 99213 is a CPT code that relates to a more complex office visit that typically involves problems of low to moderate severity and a fifteen-minute face-to-face encounter with a patient.

87.   CW-4 also provided a superbill that he/she completed and provided to Lakeshore Spine & Pain's main office in Ludington, Michigan for services rendered to patient R.A. on February 18, 2011.  For that visit, CW-4 checked the line for "99212."  CW-4 also provided a printout from the eThomas system showing that, for that same office visit, Lakeshore Spine & Pain billed Molina Healthcare using CPT code "99214."  I am informed that 99214 is a CPT code that relates to a more complex office visit that typically involves problems of moderate to high severity and a twenty-five-minute face-to-face encounter with a patient.

88.   CW-4 also provided a superbill that he/she completed and provided to Lakeshore Spine & Pain's main office in Ludington, Michigan for services rendered to patient K.D. on February 18, 2011.  For that visit, CW-4 checked the line for "99211."  I am informed that 99211 is the CPT code for the lowest-level office visit, one that typically involves minimal problems and a five-minute face-to-face encounter with a patient.  CW-4 also provided a printout from the eThomas system showing that, for that same office visit, Lakeshore Spine & Pain billed Health Plan of Michigan using CPT code "99213."

89.   CW-4 also provided a superbill that he/she completed and provided to Lakeshore Spine & Pain's main office in Ludington, Michigan for services rendered to patient C.C. on June 1, 2011.  For that visit, CW-4 checked the line for "99212."  CW-4 also provided a printout from the eThomas system showing that, for that same office visit, Lakeshore Spine & Pain billed Michigan Medicaid using CPT code "99213."

90.   CW-4 also provided a superbill that he/she completed and provided to Lakeshore Spine & Pain's main office in Ludington, Michigan for services rendered to patient D.P. on June 13, 2011.  For that visit, CW-4 checked the line for "99212."  CW-4 also provided a printout from the eThomas system showing that, for that same office visit, Lakeshore Spine & Pain billed Blue Cross Blue Shield of Michigan using CPT code "99213."

**November 9, 2011: Recorded Conversation With RATHOD and MAKWANA**

91.     On or about November 9, 2011, at the request of law enforcement, CW-4 recorded a conversation with RATHOD and MAKWANA at the Lakeshore Spine & Pain medical office located at 1380 East Main Street, Edmore, Michigan 48829.  The conversation was recorded in audio.

92.     During the conversation, CW-4 informed RATHOD that, "Since the day I started here, your billing company is overbilling my bills."  CW-4 stated that he talked to MAKWANA and RATHOD about the issue, but the problem was not resolved.  RATHOD disclaimed knowledge of the billing issues and called MAKWANA.  RATHOD told MAKWANA, "Raj, I already told you so many times . . . .  I am telling you very seriously, if I have to change the billing department, I will change the billing department immediately.  Whenever I have meeting with anybody, if one of the employees tells me, 'Your billing department is doing wrong billing and I'm frustrated because of this thing, and they're doing fraud,' and this and this . . . .  I cannot take any more of this."  MAKWANA initially denied changing any billings.  CW-4 then said that he/she had collected his/her billings for one year and would show MAKWANA that "you guys are overbilling" and to "be careful what you are billing for."  MAKWANA said, "Right, right, right.  I listen you, doctor."

93.     During the conversation, RATHOD told CW-4 that, "I am the boss, but he [MAKWANA] is the billing manager."  RATHOD told MAKWANA, "I have told you so many times, if you guys want to change something, talk to the physician.  If something is not right, talk to the physician.  Only you can bill something is it approved by physician."  MAKWANA said, "Sure, that's true, that's true, yep, yep."  RATHOD also said, "How many times do I have to tell you that you do not change anything.  Do not change anything.  This is very serious matter."

**It Is A Violation Of The Federal Anti-Kickback Statute To Pay Or Offer To Pay, Or Receive Or Solicit, Any Remuneration In Exchange For The Referral Of Federal Health Care Program Business**

94.     From my training and experience as an agent working on health care fraud investigations, and in consultation with the U.S. Attorney's Office, I am familiar with the following relevant statutory provisions.

95.     Title 18, United States Code, Section 371 provides, in relevant part, that:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

96.     The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, prohibits anyone from paying or offering to pay, or receiving or soliciting, any remuneration—including kickbacks or bribes—in exchange for the referral of Medicare and Medicaid patients, or other federally-insured beneficiaries, to other health care providers, unless such payments meet one of the statutory exceptions, *see id.* § 1320a-7b(b)(3), or one of the so-called regulatory "safe harbors," *see* 42 C.F.R. § 1001.952.

97.   Specifically, the Anti-Kickback Statute provides, in relevant part, that:

whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(1)(A).

98.   The Anti-Kickback Statute also provides, in relevant part, that:

whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment made be made in whole or in part under a Federal health care program . . .

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(2)(A).

99.   Medicare is a federally-funded program administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the United States Department of Health and Human Services.  Medicare provides health insurance for, among others, persons aged 65 and older, certain younger people with disabilities, and people with end-stage renal disease.  The Medicare program was established by Congress in 1965 as part of Title XVIII of the Social Security Act.  The Medicare program qualifies as a Federal health care program for purposes of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  *See* 42 U.S.C. § 1320a-7b(f).

100.   Medicaid is a federally-assisted grant program for the states.  At the federal level, the Medicaid program is administered by CMS.  At the state level, in Michigan, Medicaid is administered by the Department of Community Health, Medical Services Administration, an agency of the State of Michigan.  Medicaid provides health insurance to Michigan residents who are indigent or otherwise do not have traditional insurance coverage.  The Medicaid program qualifies as a Federal health care program for purposes of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).  *See* 42 U.S.C. § 1320a-7b(f).

101.   As discussed more fully above, the facts developed to date establish probable cause that RATHOD, MAKWANA, and NAKUM knowingly conspired with each other and others to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly,

23

in return for the referral of individuals to a person for the furnishing or arranging for the furnishing of services for which payment may be made in whole or in part under Medicare or Medicaid, in violation of 18 U.S.C. § 371 and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

## Billing For Higher-Paying Services Than Those That Are Actually Rendered Constitutes Health Care Fraud

102.    From my training and experience as an agent working on health care fraud investigations, and in consultation with the U.S. Attorney's Office, I am familiar with the following relevant statutory provisions.

103.    Title 18, United States Code, Section 1347 provides, in relevant part, that:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –

> to defraud any health care benefit program . . .

> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. . . .

104.    Title 18, United States Code, Section 1347 further provides that "[w]ith respect to violations of this section [18 U.S.C. § 1347], a person need not have actual knowledge of this section or specific intent to commit a violation of this section."

105.    As discussed, above, Medicare is a federally-funded program administered by CMS that provides health insurance for, among others, persons aged 65 and older, certain younger people with disabilities, and people with end-stage renal disease.  The Medicare program qualifies as a health care benefit program within the meaning of 18 U.S.C. § 1347.

106.    Medicare has several components, including Medicare Part B (Supplemental Medical Insurance).  Medicare Part B covers physicians' services, certain other medical equipment and services, and other outpatient services.  Medicare will only reimburse claims for services that are reasonable, medically necessary, and actually rendered.

107.    Wisconsin Physicians Services ("WPS") contracts with CMS to process Medicare Part B claims in the State of Michigan.  Pursuant to that agreement, WPS distributes federal Medicare funds to Michigan health care providers who file claims for payment under Medicare Part B.

108.    WPS requires health care providers to provide a diagnostic code and a procedure code on claims in order to be paid for professional services rendered to Medicare beneficiaries.  Payment for services depends upon the specific diagnostic and procedure codes indicated on the claim form.

109.    As discussed above, Medicaid is a federally-assisted grant program for the states administered by CMS (at the federal level) and the Michigan Department of Community Health (at the state level) that provides health insurance to Michigan residents who are indigent or

otherwise do not have traditional insurance coverage.  The Medicaid program qualifies as a health care benefit program within the meaning of 18 U.S.C. § 1347.

110.    Michigan Medicaid beneficiaries have the option of selecting from managed care or fee-for-service plans.  The Medicaid program contracts with various insurance companies in the State of Michigan, including Molina Healthcare and McLaren Health Plan, to process claims made under Medicaid managed care plans.  Under both the managed care and fee-for-service plans, the Michigan Medicaid program requires providers to provide a diagnostic code and a procedure code on claims in order to be paid for professional services rendered to Medicaid beneficiaries.  Payment amounts depend upon the specific diagnostic and procedure codes indicated on the claim form.

111.    Blue Cross Blue Shield of Michigan ("BCBSM") is a private, non-profit health care company that qualifies as a health care benefit program within the meaning of 18 U.S.C. § 1347.  BCBSM requires health care providers to provide a diagnostic code and a procedure code on claims in order to be paid for professional services rendered to BCBSM beneficiaries.  Payment for services depends upon the specific diagnostic and procedure codes indicated on the claim form.

112.    I am informed that consistent with the payment criteria identified above, Medicare, Medicaid, and BCBSM would not pay claims for higher levels of service than the services that are actually rendered by a provider.

113.    As discussed more fully above, the facts developed to date indicate that MAKWANA is causing Lakeshore Spine & Pain to submit claims for reimbursement to Medicare, Medicaid, and BCBSM using CPT codes for services that are more complex—and eligible for higher reimbursements—than the services rendered at the Lakeshore Spine & Pain Facilities listed on **Attachment B**.  There is probable cause to believe, therefore, that MAKWANA, by engaging in systematic up-coding, is defrauding health care benefit programs in violation of 18 U.S.C. § 1347.

## EVIDENCE, FRUITS, AND INSTRUMENTALITIES

114.    Based on my training and experience, I know that health care providers normally maintain documents and records relating to the delivery of medical services, such as patient charts, as well as documents concerning the business end of their health care practice, such as claims records, bank records, billing records, and check/voucher receipts.

115.    From my training and experience, I know that health care providers are given and obtain insurance provider manuals, coding manuals, billing manuals, and other bulletins that describe proper billing procedures and regulations.

116.    Based on my training and experience, I know that health care professionals commonly utilize computers, portable electronic devices, including tablets, personal digital assistants, and cellular or smart phones to store records, data, and communications regarding the treatment of patients and billing of services.

117.    I further know that computer software, data and documentation, passwords and hardware may be important to a criminal investigation in two specific respects.  First, the described items themselves may be instruments, fruits, or evidence of a crime.  Second, the described computer-related items may have been used to collect and store information, in the form of electronic data, about a crime.  Rule 41 of the Federal Rules of Criminal Procedure permits the Government to search and seize computer software, data and documentation, passwords and hardware which are instruments, fruits, or evidence of a crime against the United States.

118.    Based upon my training and experience, as well as information related to me by qualified experts involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact discs, magnetic tapes, and memory chips.

119.    I am aware through discussions with members of the FBI Computer Analysis Recovery Team (CART) that conducting a search of even a personal or basic desktop computer system, documenting the search, and making evidentiary and discovery copies is a lengthy process. Therefore, during the search of the premises, it is not always possible to search computer equipment and storage devices for a number of reasons, including the following:

     a.      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

     b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

     c.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of story forty gigabytes of data are now commonplace in desktop computers.

     d.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of different methods, including the use of innocuous or misleading filenames and extensions.  Computer users can also attempt to conceal data by

using encryption, which means that a password or device, such as a "keycard," is necessary to decrypt the data into readable form.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, fruits, or instrumentalities of a crime.

120.    In searching for data capable of being read, stored, or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "Forensic Computer Examiners") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on site and imaged in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b.    If the Forensic Computer Examiners can image the computer equipment and storage devices on site, they will do so.

c.    If the Forensic Computer Examiners determine that it is not practical to perform an on-site search or make an on-site copy of the data, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized and set forth herein.

d.    In searching data, the Forensic Computer Examiners will examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel will search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

121.    For the reasons set forth in the preceding paragraphs, I request authority to seize the computer-related items found during the search in order to allow trained agents to make exact duplicate copies of and to search any and all computer storage devices in a controlled environment.  A CART team member or Forensic Computer Examiners will be present for the execution of the search warrant and will personally supervise the seizing and subsequent processing of any computer equipment.  If the Forensic Computer Examiners determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, the Government will return these items within a reasonable period of time.

122.    Accordingly, I have reasonable cause to believe that each item listed in **Attachment D** is subject to seizure because it has been used as the means of committing a criminal offense, would constitute the fruits of the crime, and/or would constitute evidence that a criminal offense has been committed, including (1) a conspiracy to pay illegal kickbacks to physicians, mid-level practitioners, and medical assistants to induce the referral of federal health care program business in violation of 18 U.S.C. § 371 and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); and (2) health care fraud in violation of 18 U.S.C. § 1347  I have further cause to believe that the items to be seized are located at the U.S. Rehab Facilities, described more fully in **Attachment**

**A**, the Lakeshore Spine & Pain Facilities, described more fully in **Attachment B**, and the Lakeshore Home Health Facilities, described more fully in **Attachment C**.

123.    In consideration of the foregoing, I respectfully request that this Court issue a search warrant for the U.S. Rehab Facilities described more fully in **Attachment A**, the Lakeshore Spine & Pain Facilities described more fully in **Attachment B**, and the Lakeshore Home Health Facilities described more fully in **Attachment C**, authorizing the search of these facilities for the items described in **Attachment D**, and the seizure of such items constituting the fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 371, 42 U.S.C. § 1320a-7b(b), and 18 U.S.C. § 1347.